1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                    SAN JOSE DIVISION

11

12   MELANIE K. SALAZAR,                    No. C-11-03840 RMW

13          Plaintiff,

14      v.                                  ORDER GRANTING PLAINTIFF'S MOTION
                                            TO REMAND AND DENYING
15   CAROLYN W. COLVIN,[1]                  DEFENDANT'S CROSS-MOTION FOR
     Acting Commissioner of Social Security, SUMMARY JUDGMENT

16                                          **[Re Docket Nos. 9, 13]**
            Defendant.
17

18

19          Plaintiff Melanie K. Salazar ("Salazar") brings this action pursuant to 42 U.S.C. § 405(g) for

20   judicial review of the final decision by the Commissioner of Social Security ("Commissioner")

21   denying her claims for disability insurance benefits under the Social Security Act.  Salazar moves

22   the court to remand her case to the Commissioner.  Also before the court is the Commissioner's

23   cross-motion for summary judgment.  Having considered the papers submitted by the parties and the

24   entire administrative record, and for the reasons set forth below, the court grants the plaintiff's

25   motion to remand and denies the Commissioner's cross-motion for summary judgment.

26   _____

27   [1]  Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.

28   Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes Carolyn W.
     Colvin for Michael J. Astrue as the defendant in this suit.

ORDER GRANTING PLAINTIFF'S MOTION TO REMAND AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY
JUDGMENT

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

# I. BACKGROUND

## A.      Procedural Background

Salazar filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act on February 21, 2007, alleging that she became unable to work due to a disabling condition on January 1, 2006.  Certified Administrative Record ("AR") 60, 97-101, 102-105.  The Commissioner denied Salazar's claim on June 22, 2007, and again on reconsideration on October 10, 2007.  AR 63-67, 72-78.  On December 10, 2007 Salazar filed a written request for a hearing before an ALJ.  AR 14, 80-81.  Salazar appeared with counsel at a hearing before the ALJ on February 12, 2009.  AR 25, 42-58.  On May 20, 2009, the ALJ denied Salazar's claim.  AR 11-24.  Thereafter, the Appeals Council of the Social Security Administration denied Salazar's request for review of the ALJ's decision.  AR 7-9.  Salazar now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## B.      The ALJ's Findings and Analysis

Salazar testified to an alleged severe impairment due to neuropathy, depression, diabetes, sleep apnea, high blood pressure, asthma, gastroesophageal reflux disease, back pain, shoulder pain, hip pain and obesity.  She also alleged that she stopped working on January 1, 2006 as a result of four surgeries in two years, an inability to keep up with her job requirements, deteriorating mental acuity, interrupted memory and thought patterns, depression, incontinence, diabetes and an inability to go outside or get out of bed several days each month.  The ALJ addressed whether claimant was disabled under sections 216(i), 223(d) and 1614 (a)(3)(A) of the Social Security Act, applying the five-step sequential evaluation process established by the Social Security Administration for determining whether an individual is disabled.  *See* 20 C.F.R. 404.1520(a), 416.920(a).[2]  At step one,

---

[2]  Pursuant to 20 C.F.R. § 404.1520(a), the Social Security Administration follows a five-step sequential inquiry for determining whether an individual is disabled.  If the applicant is deemed "not disabled" at any of the steps, the analysis ends there.  *Id.* § 404.1520(a)(4).  Step one requires the ALJ to determine whether the claimant is engaging in "substantial gainful" work activity.  *Id.* §§ 404.1520(a)(4)(i), 404.1520(b).  Step two requires the ALJ to determine whether the claimant has a "severe" medical impairment or combination of impairments that (1) "significantly limits [claimant's] physical or mental ability to do basic work activities" and (2) meets the durational requirement (a continuous period of at least twelve months).  *Id.* §§ 404.1520(a)(4)(ii), 404.1520(c), 404.1509.  Step three requires the ALJ to determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20

**United States District Court**
For the Northern District of California

the ALJ found that claimant had not engaged in substantial gainful activity since January 1, 2006, and thus continued to step two. At step two, the ALJ concluded that Salazar suffers from a severe combination of *physical* impairments, specifically "obesity; hypertension; hyperlipidemia; calcific tendinitis of the left shoulder; non-insulin-dependent diabetes mellitus; mild asthma; gastroesophageal reflux disease; and mild polyarthritis" but does not suffer from a "severe medically determinable *mental* impairment." AR 16. With respect to her alleged mental impairment, the ALJ concluded "that claimant's depression was the result of her physical impairments and life stressors and that it caused no more than minimal restriction of her ability to perform essential work activities." AR 16. At step three, the ALJ determined that Salazar does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, so he proceeded to step four. In determining Salazar's residual functional capacity, the ALJ found that she "is limited to lifting and carrying no more than 50 pounds occasionally and no more than 25 pounds frequently"; "limited to standing and/or walking no more than 6 hours total in an 8-hour workday and sitting no more than 6 hours total in an 8-hour workday"; "limited to kneeling, crawling, climbing ramps or stairs, and performing overhead reaching with her left upper extremity no more than occasionally"; "has mild restriction of her ability to understand, remember, and carry out the complex or detailed tasks characteristic of skilled or semiskilled work"; and "mild restriction of her ability to relate appropriately to supervisors, coworkers, and the general public." AR 17. In making this finding, the ALJ stated that he took into account all the symptoms that can be reasonably accepted as consistent with objective medical evidence and considered opinion evidence as required by 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 96-3p. *Id.*

---

C.F.R. Part 404, Subpart P, Appendix 1. *Id.* §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926. If this requirement is met, the claimant is disabled. If not, the analysis proceeds to the next step. At step four, the ALJ must determine the claimant's residual functional capacity (i.e., ability to do physical and mental work activities on a sustained basis despite limitations all impairments, including those that are not severe), and based thereon determine whether the claimant can perform the requirements of her past relevant work. *Id.* §§ 404.1520(e)-(f), 416.920(e)-(f), 401.1545, 416.945, SSR 96-8p. If the claimant has the residual functional capacity to do her past relevant work, she is not disabled, but if the claimant is unable to do any past relevant work or does not have any, the ALJ must proceed to the fifth and final step. The final step requires the ALJ to ask whether the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience. *Id.* §§ 404.1520(g), 416.920(g).

ORDER GRANTING PLAINTIFF'S MOTION TO REMAND AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    In evaluating Salazar's symptoms, the ALJ followed a two-step process: he first determined

2    whether there was an underlying medically determinable physical or mental impairment (i.e., an

3    impairment that can be shown by medically acceptable diagnostic techniques to be reasonably

4    expected to produce the claimant's pain or symptoms); and, second, he evaluated the intensity,

5    persistence, and limiting effects of the claimant's symptoms to determine the extent to which they

6    limit her ability to perform basic work activities.  *See* 20 C.F.R. § 404.1529.  The ALJ concluded

7    that Salazar's "medically determinable impairments could reasonably be expected to cause the

8    alleged symptoms" but that "[her] statements concerning the intensity, persistence and limiting

9    effects of these symptoms are not generally credible."  AR 22.  The ALJ noted what he considered to

10   be significant inconsistencies among Salazar's testimony, statements made in her application

11   materials, and objective medical evidence, which he found undermined the credibility of her

12   subjective statements and complaints.  *Id.*[3]  At step four, the ALJ compared Salazar's residual

13   functional capacity with the demands of her past relevant work as a domestic violence counselor

14   and, relying on Vocational Expert ("VE") testimony, concluded that Salazar was capable of

15   performing her past relevant work.  AR 23.  Accordingly, the ALJ concluded that Salazar was not

16   disabled, as defined in the Social Security Act, from January 1, 2006 through the date of the

17   decision.  *Id.*

18   **C.**    **Salazar's Age, Educational, and Vocational History**

19       Salazar was born on September 15, 1948, and received a bachelor's degree in psychology in

20   1994.  AR 125, 159, 223.  She received special training in domestic violence in 1995.  AR 125.

---

[3]  In reaching this conclusion, the ALJ considered claimant's subjective complaints; the failure of claimant's treating and examining physicians to corroborate the degree of limitations alleged; claimant's inconsistency of her complaints to her doctors and at the hearing; the diagnoses and prognoses made by claimant's treating and examining physicians; the conflicting and uncontroverted medical opinion evidence indicating that claimant's symptoms and limitations are not nearly as severe as she alleges; the presence of several essentially normal or only minimally abnormal examinations and diagnostic test results in the record; claimant's failure to receive treatment from a mental health specialist without reasonable or credible explanation despite complaints of disabling anxiety and depression; claimant's receipt of only routine and conservative treatment despite complaints of disabling incontinence, shoulder pain, and knee pain; her acknowledgment of daily activities at a level fundamentally inconsistent with complaints of disabling symptoms, such as performing household chores, doing laundry, taking care of her seriously ill mother, and driving; and her inconsistent work history and earnings record even prior to the alleged onset of disability.  AR 22-23.

ORDER GRANTING PLAINTIFF'S MOTION TO REMAND AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

Salazar was employed as a domestic violence specialist at "Next Door," a domestic violence agency, from December 1994 until June 2002.  AR 120, 223.  At "Next Door," she worked 40 hours per week.  *Id.*  In this position, Salazar directed a domestic violence shelter by performing client services, undertaking house management, planning and implementing daily activities, and originating forms and procedures.  *Id.*  From 2002 to 2005, after undergoing four surgeries, AR 217, Salazar worked as a group facilitator and counselor for another domestic violence agency, "New Beginnings," where she worked 20 hours per week.  AR 120, 223.  Salazar was terminated from her position at "New Beginnings" when she breached a client's confidentiality by mailing graduation certificates to incorrect recipients.  AR 145, 223.

**D.     Salazar's Medical History**

Salazar alleges disability beginning January 1, 2006 due to: neuropathy, depression, diabetes, sleep apnea, hypertension, asthma, gastroesophageal reflux disease (GERD), back, shoulder, and hip pain, and obesity.  AR 16, 18, 119.  Because the ALJ found Salazar had a severe combination of medically determinable *physical* impairments, her appeal is primarily directed to her allegations that the ALJ improperly assessed her alleged *mental* impairments.  For this reason, the court concentrates its discussion of Salazar's medical history on her alleged functional limitations resulting from her mental health impairments separately, and in combination with, her physical impairments.

Salazar asserts that she suffers from disabling depression.  Salazar stated to some of her physicians that she has suffered from depression over the course of her entire life.  AR 222.  In 1968, at age 20, Salazar was hospitalized in Maricopa Psychiatric Hospital for two weeks when she became very depressed.  AR 222-23.  After being hospitalized, Salazar was prescribed medication, but did not continue taking it for very long.  AR 222.  In the late 1980s, Salazar was again seen by a therapist and had short-term therapy.  *Id.*  In 1996, Salazar visited a psychologist, who provided her with a few counseling sessions.  *Id.*  In her applications for benefits, Salazar submitted medical records from several physicians documenting her complaints of, and treatment for, depression.  The court discusses each physician's records, along with the ALJ's analysis of those records.

**1.     Primary Care Physician: Dr. Chang**

Salazar received treatment for depression from her primary care physician, Natalie H. Chang,

M.D., a board certified internist.  The record does not clearly indicate when Dr. Chang's treatment for depression began.  A medication list dated June 10, 2005 indicates that Dr. Chang prescribed Prozac for Salazar to treat depression.  AR 172.  Sometime in 2005, Dr. Chang changed Salazar's Prozac prescription to Cymbalta and added Wellbutrin.  AR 222. Dr. Chang's records do not appear to include any psychiatric diagnosis or any findings concerning the extent of any mental impairment. In notes dated February 14, 2006, Dr. Chang wrote that Salazar "was laid off from work" and is "extremely anxious about [her] current situation" and other notes from that date indicate "anxiety" and "depression."  AR 194.  Those notes also indicate that Dr. Chang prescribed Wellbutrin XL for Salazar.  *Id.*  On April 18, 2006, Dr. Chang increased Salazar's dosage of Wellbutrin noting that Salazar reported that she was not able to cope with her depression.  AR 192.  In notes dated May 24, 2006, Dr. Chang wrote that Salazar was "more calm" and that her depression had improved with medication.  AR 190.  Then, in medical records dated April 30, 2007, Dr. Chang wrote that Salazar reported that her "[d]epression is getting worse" and that she was "not sleeping." Dr. Chang referred Salazar to pyschotherapy.  AR 167.  In her testimony, Salazar reported that Dr. Chang advised her to reduce her weekly workload from 32 hours per week down to 20 hours per week because of her depression, incontinence, and diabetes and because she was missing work.  AR 48.  It does not appear that Salazar followed up on Dr. Chang's referral to psychotherapy, although she saw a marriage and family counselor, Ann McDonald Rice, R.N., M.A.

The ALJ reviewed Dr. Chang's treatment notes covering dates between February 2, 2006 and August 17, 2007.  AR 19.  The ALJ found that although Salazar "complained of anxiety and depression, she repeatedly presented a completely normal mental status examination and was not referred to a psychiatrist or psychologist, but was instead described as stable on the medications" that Dr. Chang had prescribed for her.  AR 19-20.  The ALJ apparently overlooked Dr. Chang's referral of Salazar for psychotherapy (Dr. Chang's handwriting is difficult to read).  The ALJ also appears to overstate what Dr. Chang's records suggest regarding the stability of Salazar's mental status. Dr. Chang changed the medications and dosages of medications for Salazar's depression and noted a number of complaints she made regarding her depression and its increase in intensity. *See* AR 167, 170, 172, 175, 190, 192, 194, 195 and 250.  At the same time, Dr. Chang's records do not

United States District Court
For the Northern District of California

appear to contain any mental health diagnosis.  Some entries do include the abbreviation "NAD" which stands for "no appreciable disease; nothing abnormal detected." www.medilexicon.com; *see, e.g.*, AR 167.  However, these entries seem to relate to Salazar physical appearance.

### 2.     Consultative Examiner: Dr. Gable

On May 7, 2007, Salazar met with agency consultative examiner ("CE") Clark E. Gable, M.D., a "board eligible"[4] physician in Internal Medicine.  Dr. Gable indicated that Salazar appeared "fairly upbeat" on the day of the evaluation, "with no significant depression obvious during the exam." AR 218.  In his written report regarding Salazar, Dr. Gable wrote that Salazar had "[s]ignificant depression, with generalized anxiety problem, and possibly panic attacks according to her." AR 219.  She reported that she was seeing a psychiatrist . *Id.*  Under the heading "FUNCTIONAL CAPACITY" in his report Dr. Gable stated: "Whether psychiatric problems militate against work is beyond the purview of this examination." *Id.*

Based on his review of Dr. Gable's written report, the ALJ indicated that Salazar "*subjectively* reported depression, general anxiety, and panic attacks[.]"  AR 20 (emphasis added). The ALJ also noted that "Dr. Gable failed to provide an opinion concerning the claimant's ability to perform work related activities on a sustained basis, stating only [t]hat 'based on the history and findings of today's examination, an assessment is somewhat difficult.'" AR 20.

The ALJ does not appear to place any weight on Dr. Gable's report in evaluating Salazar's mental disorder.  Since Dr. Gable is an internist and not a psychiatrist or psychologist, had no medical records available to him when he performed his evaluation and expressly said that whether Salazar had psychiatric problems that interfered with work was not within the scope of his report, Dr. Gable's opinions were limited to an evaluation of Salazar's physical limitations.

### 3.     Consultative Examiner: Dr. Acenas

On May 11, 2007, Salazar was evaluated by CE, Antoinette Acenas, M.D., a board certified psychiatrist.  AR 222-25.  In her report, Dr. Acenas summarizes Salazar's medical and family history and her performance on an intellectual functioning examination. Dr. Acenas made the

---

[4]  The ALJ identified Dr. Gable as a board-certified internist.  In her papers, Salazar disputes that Dr. Gable was board-certified, noting that he is only board-eligible.  Salazar is correct, but the point is immaterial for the purposes of this order.

1   following diagnoses of Salazar's mental disorders based on the DSM-IV[5]:  On Axis I, Dr. Acenas

2   indicated that Salazar's physical condition caused her psychological symptoms, along with

3   polysubstance abuse in questionable remission.  AR 224.  On Axis II, Dr. Acenas indicated the

4   Salazar suffered from a mood disorder.  AR 225.  On Axis III Dr. Acenas noted that asthma,

5   hypertension, diabetes mellitus, neuropathy, and sleep apnea may influence Salazar's  mental

6   condition.  On Axis IV Dr. Acenas stated that Salazar was subject to moderate stress from her

7   unemployment and medical condition. On Axis V, Dr. Acenas assigned Salazar a GAF[6] scale score

8   _____

9   [5]  There are five axes in the DSM diagnostic system, each relating to a different aspect of a mental
     disorder:

10          Axis I: This is the top-level diagnosis that usually represents the acute symptoms that need
     treatment; Axis 1 diagnoses are the most familiar and widely recognized (e.g., major depressive

11   episode, schizophrenic episode, panic attack). Axis I terms are classified according to V-codes by
     the medical industry (primarily for billing and insurance purposes).

12          Axis II: Axis II is the assessment of personality disorders and intellectual disabilities. These
     disorders are usually life-long problems that first arise in childhood.

13          Axis III: Axis III is for medical or neurological conditions that may influence a psychiatric
     problem. For example, diabetes might cause extreme fatigue which may lead to a depressive

14   episode.

15          Axis IV: Axis IV identifies recent psychosocial stressors - a death of a loved one, divorce,
     losing a job, etc. - that may affect the diagnosis, treatment, and prognosis of mental disorders.

16          Axis V: Axis V identifies the patient's level of function on a scale of 0-100, (100 is top-level
     functioning). Known as the Global Assessment of Functioning (GAF) Scale, it attempts to quantify a
     patient's ability to function in daily life.

17   Psy*Web*.com

18   [6]  The GAF scale: 91 - 100 No symptoms. Superior functioning in a wide range of activities, life's
     problems never seem to get out of hand, is sought out by others because of his or her many positive

19   qualities. 81 - 90 Absent or minimal symptoms (e.g., mild anxiety before an exam), good
     functioning in all areas, interested and involved in a wide range of activities, socially effective,

20   generally satisfied with life, no more than everyday problems or concerns. 71 - 80 If symptoms are
     present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty

21   concentrating after family argument); no more than slight impairment in social, occupational, or
     school functioning (e.g., temporarily falling behind in schoolwork). 61 - 70 Some mild symptoms

22   (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school
     functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty

23   well, has some meaningful interpersonal relationships. 51 - 60 Moderate symptoms (e.g., flat affect
     and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational,

24   or school functioning (e.g., few friends, conflicts with peers or co-workers). 41 - 50 Serious
     symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious

25   impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job,
     cannot work). 31 - 40 Some impairment in reality testing or communication (e.g., speech is at times

26   illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family
     relations, judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is

27   unable to work; child frequently beats up younger children, is defiant at home, and is failing at
     school). 21 - 30 Behavior is considerably influenced by delusions or hallucinations or serious

28   impairment, in communication or judgment (e.g., sometimes incoherent, acts grossly
     inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed
     all day, no job, home, or friends) 11 - 20 Some danger of hurting self or others (e.g., suicide attempts

ORDER GRANTING PLAINTIFF'S MOTION TO REMAND AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY
JUDGMENT

8

United States District Court
For the Northern District of California

of 70.  *Id.*

       Dr. Acenas also made the following functional assessment:

> The claimant is capable of managing her own funds.  She has basic mathematic skills.
>
> The claimant is able to perform simple and repetitive tasks as well as accept instructions from supervisors. Based on her mental capabilities and not considering physical matters, the claimant can perform work activities on a consistent basis and maintain regular attendance in the workplace as well as complete a normal workweek.
>
> She would likewise be able to deal with usual stress encountered in competitive work.

*Id.*

       On November 14, 2008, Salazar was again examined by Dr. Acenas.  AR 272-74.  Based on this examination, Dr. Acenas made nearly identical findings[7] to those she made in her previous report, concluding that Salazar was receiving appropriate psychiatric treatment and that the likelihood of her recovery was dependent upon recovery from physical symptoms.  AR 273.  Dr. Acenas further concluded that based on her mental capabilities, Salazar would be able to perform work activities on a consistent basis, maintain regular attendance in the workplace and perform a normal workweek.  AR 273-74.  Dr. Acenas again assigned Salazar a GAF of 70.  AR 273.

       In an accompanying form entitled  "Medical Source Statement of Ability to Do Work Related Activities (Mental)," Dr. Acenas indicated that Salazar had no impairments with respect to: understanding and remembering simple instructions, carrying out simple instructions, and being able to make judgments on simple work-related decisions.  AR 275.  On the same form, Dr. Acenas

---

without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (e.g., smears feces) or gross impairment in communication (e.g., largely incoherent or mute). 1 - 10 Persistent danger of severely hurting self or others (e.g., recurrent violence) or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death. 0 Inadequate information.

Global Assessment of Functioning from Wikipedia

[7]  The November 14, 2008 report omits the Axis I diagnosis of polysubstance abuse and makes no diagnosis under Axis II.  It also says that Salazar is currently being followed by a psychiatrist by the name of Dr. Cabebe and that in October 2007 she saw Dr. Alex Morales who took her off of Cymbalta and put her back on Prozac.  Salazar reported that Dr. Acenas had "messed her up" in placing her on Cymbalta. AR 272.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

indicated that Salazar had only mild impairments with respect to: understanding and remembering complex instructions, carrying out complex instructions, and the ability to make judgments on complex work-related decisions.  *Id.*  Dr. Acenas also found that Salazar had only mild impairments with respect to: interacting appropriately with the public, interacting appropriately with supervisors, interacting appropriately with co-workers, and responding appropriately to usual work situations and to changes in a routine work setting.  AR 276.  However, Dr. Acenas did not fill in the blanks provided on the Medical Source Statement (Mental), which requested the identification of factors to support her functional assessments.

The ALJ accepted Dr. Acenas' conclusion that Salazar's depression was a result of her physical conditions and that it did not affect her ability to perform simple repetitive tasks.  AR 16, 21.  The ALJ also found "no basis for interpreting Dr. Acenas['s] positive statement that [Salazar] is capable of performing simple and repetitive tasks into a negative statement that [Salazar] would therefore be incapable of performing more than simple and repetitive tasks" as contended by Salazar.  AR 22.  The ALJ pointed out that in her Medical Source Statement (Mental) Dr. Acenas specifically stated that Salazar only had mild restriction in her ability to understand, remember, carry out and make judgments on complex work related decisions. *Id.*, AR 275.  The ALJ interpreted the GAF score of 70 according to DSM-IV as showing that Salazar experienced only mild symptoms and generally functioned pretty well and was able to have some meaningful interpersonal relationships.  AR 21.  The ALJ found no basis for concluding Salazar could not do her past work with domestic violence victims.

### 4.    Treating Therapist: Rice

In her testimony before the ALJ, Salazar related that she received ongoing therapy from licensed marriage and family therapist, Ann McDonald Rice, R.N., M.A. ("Ms. Rice").  AR 51-54.  In a letter dated September 17, 2007, Ms. Rice wrote that she had only seen Salazar twice and therefore did not believe that she could provide a full evaluation of Salazar's physical and psychological health.  AR 269.  In that letter, Ms. Rice nevertheless indicated that based on the two sessions that she had with Salazar, and based on the symptoms that Salazar reported, there seemed to be a basis for a claim of disability.  *Id.*  Ms. Rice's notes indicate that Salazar's grooming was

ORDER GRANTING PLAINTIFF'S MOTION TO REMAND AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

1   "sl[ightly] disheveled[,]" her motor activity "sl[ightly] restless[,]" and that her interview behavior

2   was "effusive." AR 266. With respect to Salazar's sensory and cognitive functioning, Ms. Rice

3   indicated that Salazar had "[d]ifficulty" with concentration, and that her memory was "[p]oor." *Id.*

4   Ms. Rice gave Salazar a GAF score of 54. *Id.* Although somewhat unclear, the records submitted

5   suggest that Salazar visited Ms. Rice on the following dates: August 16, 2007; September 10, 2007;

6   October 16, 2007; October 30, 2007; and December 4, 2007. AR 266-67, 281-82. At the ALJ

7   hearing, when asked by her attorney why she had not seen a psychiatrist between the time that she

8   stopped working in January 2006 and when her mother first moved in with her in around December

9   2008, Salazar testified that she elected not to see a psychiatrist because she had seen Ms. Rice either

10  once a week, or once every two weeks. AR 51.[8]

11       In his written decision, the ALJ concluded that Salazar had received treatment from Rice

12  between August 16, 2007 and December 4, 2007. AR 21.[9] The ALJ found that the "[p]rogress notes

13  from [Ms.] Rice reveal that [Salazar's] mental status examinations were only minimally abnormal."

14  AR 21. The ALJ further noted that Rice had assigned the claimant a GAF score of 54, which the

15  ALJ concluded to be "indicative of only moderate symptoms and limitations." *Id.* The ALJ noted

16  that Rice "declined to provide an opinion concerning the claimant's ability to perform work activity

17  due to only seeing the claimant on a handful of occasions." *Id.* Elsewhere in his decision, the ALJ

18  concluded that Salazar's testimony regarding the frequency of her visits to Rice contradicted the

19  record. Specifically, the ALJ noted that Salazar had testified that she received treatment from Rice

20  between January 2006 and 2009, but that progress notes by Rice, contained in the record, indicated

21  that Salazar had only seen her on August 16, 2007, September 10, 2007, October 16, 2007, and

22  December 4, 2007.

23

24  [8] The court notes that Salazar's testimony regarding the frequency of her visits, along with the
25  explanations that she provided for failure to visit a psychiatrist were generally inconsistent and
    disjointed during her hearing before the ALJ. *See generally* AR 51-54.

26  [9] The ALJ's decision indicates that Salazar "received treatment from licensed marriage and family
27  therapist [Ms.] Rice August 16, 2007 and December 4, 2007." Later in the decision, the ALJ
    indicates that Salazar visited Rice on "for [*sic*] occasions over a four-month period." On this record,
28  the court reads the ALJ's decision as finding that Salazar received treatment *between* August 16,
    2007 and December 4, 2007, because this interpretation is most consistent with the ALJ's opinion as
    a whole.

ORDER GRANTING PLAINTIFF'S MOTION TO REMAND AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY
JUDGMENT

United States District Court
For the Northern District of California

**5.      Consultative Examiner: Dr. Lucila**

On June 18, 2007 agency psychiatric CE Danilo Lucila, M.D. submitted a Psychiatric Review Technique Form ("PRTF") after reviewing all the evidence present in Salazar's record at that date. AR 234-44. Dr. Lucila left nearly the entire form blank. *Id.* The evaluation indicated that his assessment was from January 1, 2006 to "Current." AR 234. Dr. Lucila indicated that Salazar's psychological medical impairments were not severe. AR 234. Dr. Lucila indicated that his medical disposition of Salazar was based on the following: (1) an affective disorder, (2) a somatoform disorder, and (3) a substance addiction disorder. *Id.* First, in diagnosing Salazar's affective disorder, Dr. Lucila indicated that Salazar presented with a "Mood DO NOS"[10]; he did not indicate any pertinent symptoms, signs, or laboratory findings that substantiate the presence of the affective disorder. AR 237. Second, in diagnosing Salazar's somatoform disorder, Dr. Lucila indicated that Salazar presented with "PHYSICAL COND CAUSING PSYCH SXS,"[11] but did not indicate any pertinent symptoms, signs, or laboratory findings that substantiate the presence of the impairment. AR 239. Finally, Dr. Lucila indicated that Salazar presented "[b]ehavioral changes or physical changes associated with the regular use of substances that affect the central nervous system"; Dr. Lucila identified these behavioral changes as "[a]ffective disorders." AR 240.

Although the PTRF provided space for Dr. Lucila to further explain "[p]ertinent symptoms, signs, and laboratory findings that substantiate the presence of the impairment," Dr. Lucila did not do so. Dr. Lucila found that Salazar had an affective disorder and a somatoform disorder but that the impairments were not severe. Although Dr. Lucila considered Salazar's affective disorder a medical determinable impairment, Salazar's affective disorder did not satisfy the diagnostic criteria set forth in the regulations but could be described as a mood disorder not otherwise specified. Similarly, Salazar had a somatoform disorder, but that disorder did not satisfy the diagnostic criteria. Dr. Lucila indicated that Salazar's physical condition was causing her symptoms. Finally, Dr. Lucila found that Salazar had behavioral changes or physical changes associated with the regular use of

---

[10]   The court reads this abbreviation as "mood disorder not otherwise specified."

[11]   The court reads this as "physical condition causing psychological symptoms."

United States District Court
For the Northern District of California

substances that affect the central nervous system but noted the impairment from this disorder may be in remission.

Dr. Lucila found the following degree of limitation on each of the four functional limitations:

| Functional Limitation | Degree of Limitation |
|---|---|
| Restriction of Activities of Daily Living | None |
| Difficulties of Maintaining Social Functioning | None |
| Difficulties of Maintaining Concentration, Persistence, or pace | Mild |
| Repeated Episodes of Decompensation, Each of an Extended Duration | One or Two |

AR 242.

Although the ALJ relied on Dr. Lucila's functional findings, Dr. Lucila did not give any detailed explanation of his findings. In his written decision, the ALJ largely adopted Dr. Lucila's conclusion that Salazar's "mental impairments would not impose more than minimal limitation on her ability to perform essential work activities and were therefore 'nonsevere.'" AR 21-22.

### 6.      Consultative Examiner: Dr. Murillo

On October 9, 2007, CE Evangeline Murillo, M.D., a psychiatrist, reviewed the record regarding Salazar's alleged impairments and submitted a "Case Analysis" form. AR 270-71. In that form, Dr. Murillo indicated that the "sources" for her written evaluation included a report from San Jose Medical Group, which she received on September 21, 2007, along with the written reports prepared by Ms. Rice, which she received on September 28, 2007. AR 270. Dr. Murrillo noted that Ms. Rice had assigned Salazar a GAF score of 54, a consultative psychiatrist had assigned a GAF score of 70 in May 2007, and that Salazar had "[r]ecent visits with therapist only." AR 270-71. Although her notes are unclear, Dr. Murillo appears to recommend affirming Dr. Lucila's Psychiatric Review Technique Form for a finding of a non-severe mental impairment on the grounds that Salazar had received a "High GAF score" from a "Psych" consultative examiner in May 2007. AR 271.

In his written decision, the ALJ adopted Dr. Murillo's conclusion that Salazar's "mental impairments would not impose more than minimal limitation of her ability [to] perform essential

1    work activities, and were therefore nonsevere."  AR 22.

2        **7.  Other Psychiatrists**

3        The administrative record suggests that Salazar saw Dr. Alex Morales, a psychiatrist, in 2007

4    (AR 51-2, 153) and Dr. Cabebe, also a psychiatrist (AR 272), in 2008.  These doctors may have seen

5    Salazar to adjust her psychiatric medications.  However, there appear to be no records from either

6    contained in the administrative record.  They are not mentioned in the ALJ's opinion.

                                **II.  ANALYSIS**

7    **A.    Standard of Review**

8        Pursuant to 42 U.S.C. § 405(g), the court has jurisdiction to review the Commissioner's

9    decision to deny benefits.  However, the district court's scope of review is limited.  In reviewing the

10   Commissioner's final decision to deny benefits, a district court must determine whether the

11   Commissioner's decision is: (1) based on proper legal standards; and (2) supported by substantial

12   evidence in the record as a whole.  *See Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).  A

13   reviewing court will not disturb the Commissioner's decision unless it is based on legal error or is

14   not supported by substantial evidence.  42 U.S.C. § 405(g); *Vertigan v. Halter*, 260 F.3d 1044, 1049

15   (9th Cir. 2001).  In this context, evidence is substantial if it is "more than a mere scintilla but less

16   than a preponderance; it is such relevant evidence that a reasonable mind might accept as adequate

17   to support a conclusion."  *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997) (quoting *Andrews

18   v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

19       To determine whether substantial evidence exists to support the ALJ's decision, the court

20   examines the administrative record as a whole and considers evidence both supporting and

21   detracting from the Commissioner's conclusion.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir.

22   1999).  Where evidence exists to support more than one rational interpretation, the court must defer

23   to the ALJ's decision.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  However, a district

24   court "'may not affirm [the Commissioner's conclusion] simply by isolating a specific quantum of

25   supporting evidence.'"  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (quoting

26   *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)).

27   **B.    Parties' Arguments**

28

United States District Court
For the Northern District of California

Salazar argues that the Administrative Law Judge ("ALJ") improperly rejected her claim for benefits because: (1) the ALJ failed to include all of her medically determinable impairments in his disability determination, specifically he failed to find that Salazar suffered from a severe mental impairment (depression); (2) the VE's testimony does not support the ALJ's conclusion that Salazar is capable of performing her past relevant work; and (3) the ALJ's determination that Salazar's complaints lack credibility is not supported by substantial evidence.  The court concludes that a more thorough evaluation of Salazar's mental impairment is required and, therefore, remand is necessary.

## C.  Salazar's Medically Determinable Impairments

In considering Salazar's residual functional capacity and disability, the ALJ did consider Salazar's depression.  *See* AR 18 (listing all of Salazar's claimed impairments, including depression).  Thus, the court interprets Salazar's argument to be that the ALJ erred at step two in concluding that Salazar did not suffer from a severe medically determinable mental impairment resulting from her depression and, even if she did not have a severe mental impairment, the ALJ committed error at step four in determining that Salazar could do her past relevant work.

At the outset, the court finds that the ALJ did not follow the  required procedure for determining the existence and severity of a mental impairment.  To determine the existence and severity of a mental impairment, at step two the ALJ must: (1) determine whether an applicant has a medically determinable mental impairment; (2) specifically rate the degree of functional limitation for four functional areas; (3) determine the severity of the impairment and then if the impairment is severe, proceed to step three of the disability analysis to determine if the impairment meets or equals a specifically listed mental disorder.  20 C.F.R. § 404.1520a; *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 725 (9th Cir. 2011).  The "four functional areas," as set forth in the regulations, are: (1) restriction of activities of daily living; (2) difficulties in maintaining social functioning; (3) difficulties in maintaining concentration, persistence, or pace; (4) episodes of decompensation for extended duration.  20 C.F.R. § 404.1520a(c)(4).  Furthermore, and significantly, "'the [ALJ's] written decision *must* incorporate the pertinent findings and conclusions based on the technique' and '*must* include a specific finding as to the degree of limitation in each of the functional areas.'"

1    *Keyser*, 648 F.3d at 725 (quoting 20 C.F.R. § 404.1520a(e)(4)) (emphasis in original).

2         The ALJ erred because the written decision does not "include a specific finding as to the

3    degree of limitation in each of the functional areas." 20 C.F.R. § 404.1520a(e)(4). In fact, the

4    written decision does not mention the four functional areas at all. Portions of the ALJ's opinion

5    could be construed as addressing some of the functional areas. For example, the ALJ does discuss

6    Salazar's ability to maintain social functioning and Salazar's ability to concentrate. Nonetheless, the

7    ALJ's opinion does not explicitly consider any of the four functional areas, nor does it make any

8    specific findings regarding Salazar's degree of limitation in any functional area. While the ALJ's

9    opinion precedes *Keyser*, the ALJ's failure to make specific written findings as to Salazar's degree

10   of limitation in each of the four functional areas constitutes legal error.

11        Additionally, "the [ALJ's] written decision *must* incorporate the pertinent findings and

12   conclusions based on the technique." *Keyser*, 648 F.3d at 725 (quoting 20 C.F.R. § 404.1520a(e)(4))

13   (emphasis in original). It is also unclear whether this requirement is met. As described in the

14   background section on Salazar's medical history, neither Dr. Acenas nor Dr. Lucida provided bases

15   for their conclusions on the four functional areas in the records. Both doctors simply checked boxes

16   on the given forms but left the space for supporting their functional assessments blank. The PRTF

17   by Dr. Lucida is filled out only to the extent that certain boxes are checked selecting particular

18   degrees of impairment. The immediately following spaces on the form for filling in the pertinent

19   symptoms, signs, and laboratory findings that substantiate the presence of the impairment are left

20   blank. AR 237, 239. The two reports of Dr. Acenas's psychiatric evaluations contain a summary of

21   Salazar's responses to questions asked to help determine her intellectual functioning. Dr. Acenas

22   does not explain whether these responses support her conclusion of minor impairment in certain

23   functions. Dr. Acenas' medical source statement, like Dr. Lucida's PRTF, has a number of boxes

24   checked indicating Dr. Acenas's conclusions as to Salazar's limitations and restrictions, but the

25   spaces on the form for identifying the factors ("e.g., the particular medical signs, laboratory findings

26   or other factors . . .") that support her assessment are not filled out. AR 275-276.

27        While the ALJ is not explicit, it appears the ALJ relied on Dr. Acenas and Dr. Lucida's

28   findings in determining the severity of Salazar's mental impairment. If the PRTF or the records of

ORDER GRANTING PLAINTIFF'S MOTION TO REMAND AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY
JUDGMENT

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Dr. Acenas or Dr. Lucida were fully completed as to Salazar's functional limitations and the

2    symptoms that support those functional limitations, the ALJ's reliance on their records would likely

3    be sufficient to "incorporate the pertinent findings and conclusions based on the [PRTF] technique."

4    *Id.*  However, given the lack of completeness, the ALJ's failure to incorporate the pertinent medical

5    findings from a fully completed PTRF or to otherwise assemble the findings on which Dr. Acenas

6    and Dr. Lucida must have relied to reach their conclusions constitutes error.

7         Remand is required unless the error is harmless.  *Keyser*, 648 F.3d at 726.  The failure is not

8    harmless if the claimant has a "colorable claim of mental impairment." *Id.*  Even if a medically

9    determinable mental impairment is not severe, the ALJ is required to take the impairment into

10   account in combination with any severe physical impairment in determining whether a claimant is

11   disabled at step four or five.

12            In determining whether your physical or mental impairment or
             impairments are of a sufficient medical severity that such impairment
13            or impairments could be the basis of eligibility under the law, *we will*
             *consider the combined effect of all of your impairments without regard*
14            *to whether any such impairment, if considered separately, would be of*
             *sufficient severity.* If we do find a medically severe combination of
15            impairments, the combined impact of the impairments will be
             considered throughout the disability determination process.
16

17   20 C.F.R. § 404.1523 (emphasis added).

18        Determining whether the error is harmless requires that the court consider Salazar's

19   contention that the ALJ ignored the opinion of Salazar's treating physician, Dr. Chang, "who

20   diagnosed depression, prescribed antidepressants and referred Ms. Salazar for psychotherapy."  P's

21   Mot. for SJ, p. 7.  Since Dr. Chang was a treating physician, her records provide a detailed,

22   longitudinal picture of Salazar's complaints and treatment for depression. *See* 20 C.F.R.

23   § 404.1527(c)(2). The ALJ found that "although the claimant . . . complained [to Dr. Chang] of

24   anxiety and depression, she repeatedly presented a completely normal mental examination and was

25   not referred to a psychiatrist or psychologist, but was instead described as stable on the medication

26   prescribed by her primary physician Dr. Natalie Chang." AR 20.

27        The ALJ's statement as to what the records show suggest a more positive view of Salazar's

28   mental health than is justified.  The records show that Salazar frequently complained about her

United States District Court
For the Northern District of California

1   worsening depression and that Dr. Chang made adjustments in Salazar's medications for depression.

2   See AR 167, 170, 172, 175, 190, 192, 194, 195, and 250.  The records also show that Dr. Chang,

3   contrary to the ALJ's comment otherwise, referred Salazar for psychotherapy.  In light of Dr.

4   Chang's frequent notations of complaints by Salazar of depression, Dr. Chang's treatment of the

5   depression by prescription drugs and her referral of Salazar to psychotherapy, Salazar cannot be

6   fairly said to have "repeatedly presented a completely normal mental examination."

7        Nevertheless, Dr. Chang's records do not appear to contain any diagnosis or opinion that

8   conflicts with the conclusions of Drs. Acenas and Lucida.  The fact that Dr. Chang prescribed

9   medication for Salazar's depression, adjusted or changed that medication or referred Salazar for

10   pyschotherapy does not necessarily mean that Dr. Chang was or was not of the opinion that Salazar

11   had a mental disease or disabling depression.[12]  Moreover, the ALJ did conclude that Salazar had

12   mental limitations. He found that "the claimant's depression was the result of her physical

13   impairments and life stressors and that it caused no more than minimal restriction of her ability to

14   perform essential work activities." AR 16.  He also found that "[t]he claimant has mild restriction of

15   her ability to understand, remember, and carry out the complex or detailed tasks characteristic of

16   skilled or semi-skilled work; and mild restriction of her ability to relate appropriately to supervisors,

17   coworkers and the general public."  AR 17.

18        Although the issue is close, the court concludes that Salazar at least presented a colorable

19   claim of mental impairment which had to be fully considered at step two and in conjunction with her

20   severe physical impairment at step four and, if reached, step five. The records from Dr. Chang,

21   Salazar's treating physician, are replete with indications that Salazar suffered from and received

22   medication for depression. AR 167, 172, 190, 194-95.  Contrary to the ALJ's conclusion that Dr.

23   Chang made no referral for counseling or psychotherapy, AR 20, Dr. Chang's records dated April

24   30, 2007 do in fact indicate that a referral had been made for psychotherapy. AR 167.  Presumably,

25   Dr. Chang believed that Salazar suffered some impairment caused by depression or she would not

26

27   [12]  Dr. Chang's records do indicate that Dr. Chang observed no apparent disease ("NOD"). *See* AR

28   167, 173, 174, 175 and 190.This observation appears to be in reference to how Salazar physically
     appeared as opposed to commenting on her mental health.

have  suggested, according to Salazar, that Salazar reduce her working hours to twenty per week (AR 48), prescribed and adjusted Salazar's antidepressant medication, and referred her for psychotherapy.   The fact that two psychiatrists, Dr. Morales and Dr. Cabebe, have apparently provided some on-going psychiatric care suggests that Salazar has some mental impairment.  AR 225 ("claimant is receiving appropriate psychiatric treatment"); AR 272 ("She is now being followed up by another psychiatrist, Dr. Cabebe"); AR. 50-55.[13]  Additionally, Ms. Rice assigned Salazar a GAF of 54, a score lower than that assigned to the claimant in question in *Keyser*, whom the Ninth Circuit determined to have established a colorable claim of a mental impairment.  Also, Ms. Rice reported, based upon her initial visits with Salazar, that Salazar presented a basis for disability.  AR 269.

**D.     Testimony of Vocational Expert**

Because the ALJ will necessarily have to reevaluate the vocational expert testimony in light of his reconsidered disability determination on remand, the court does not reach the question of whether the opinion of the vocational expert supports or does not support a finding of disability.  On remand the ALJ must make sure that all of Salazar's severe physical impairments and her mental impairments, whether or not such impairments are deemed "severe," are included in any hypothetical asked of the vocational expert. The ALJ may not rely on hypotheticals that are not specific to Salazar's physical and mental conditions to justify his determination.  *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012).

**E.     Credibility**

Salazar further alleges that the ALJ erred in finding that she was not credible.  Because the ALJ will necessarily have to reevaluate Salazar's credibility based, in part, on what the evidence shows concerning Salazar's treatment and functional limitations, the court does not review the ALJ's credibility determination.  On remand, it may be that Salazar's vague and seemingly inconsistent

---

[13]  The record is ambiguous as to what psychiatric and mental health care Salazar has had and continues to have.  On remand the ALJ may need to develop the record with respect to such care. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) ("The ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered. . . . to the represented as well as to the unrepresented claimant").

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  testimony about what doctors she has seen and been treated by results from innocent confusion and

2  does not raise a question about the accuracy and honesty of her testimony concerning her allegedly

3  disabling symptoms.  On the other hand, Salazar's testimony may be found to exaggerate the

4  discomfort she claims when it is considered along with the records showing limited treatment for her

5  complaints, the lack of objective evidence explaining the source of her complaints, the conservative

6  treatment she received, and her ability to care for her mother.

7       Determining the credibility of a claimant's testimony regarding subjective symptoms

8  demands that an ALJ engage in a two-part analysis.  *Lingenfelter*, 504 F.3d at 1036.  "First, the ALJ

9  must determine whether the claimant has presented objective medical evidence of an underlying

10  impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"

11  *Id.* (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc) (internal quotation

12  marks omitted).  Second, if the claimant meets this first test and there is no evidence of malingering,

13  "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering

14  specific, clear and convincing reasons for doing so."  *Smolen v. Chater*, 80 F.3d at 1281; *see also*

15  *Robbins*, 466 F.3d at 883 ("[U]nless an ALJ makes a finding of malingering based on affirmative

16  evidence thereof, he or she may only find an applicant not credible by making specific findings as to

17  credibility and stating clear and convincing reasons for each.").

## E.  Remand

18

19       The court suggests no conclusion as to whether Salazar has established or could establish a

20  mental impairment which separately or in combination with her severe physical impairments

21  prevents Salazar from doing her past relevant work or other work given her age, education,

22  experience and residual functional capacity.  The court only finds that Salazar has presented a

23  "colorable claim" and the case must be remanded so the ALJ can re-evaluate the case in accordance

24  with the requirements of *Keyser*.  The ALJ or parties may also want to develop the record further by

25  having Dr. Acenas and Dr. Lucida fully complete their functional analyses and seek reports from

26  Drs. Chang, Morales and Cabebe as to their findings regarding any mental functional limitations

27  they believe Salazar had during the applicable time period.

28

## V. ORDER

ORDER GRANTING PLAINTIFF'S MOTION TO REMAND AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY
JUDGMENT

1    For the foregoing reasons, the court GRANTS Salazar's motion for summary judgment and

2  DENIES the Commissioner's cross-motion for summary judgment.  The court REMANDS to the

3  Commissioner with instructions to properly evaluate Salazar's four functional limitations with

4  respect to her mental impairments at step two.  Because Salazar apparently admits that none of her

5  impairments meet or equal a listed impairment, either singly or in combination, the ALJ may

6  proceed to step four after rendering a new determination at step two.

7

8

9  DATED: July 28, 2014

10                                                           RONALD M. WHYTE
                                                             United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California